IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | |
|---|---|
| JAMES A. WALKER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CIVIL ACTION NO. 3:09CV269-SRW |
| ) | (WO) |
| MICHAEL J. ASTRUE, Commissioner ) | |
| of Social Security, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OF OPINION**

Plaintiff James A. Walker brings this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) seeking judicial review of a decision by the Commissioner of Social Security ("Commissioner") denying his application for disability insurance benefits and supplemental security income under the Social Security Act. The parties have consented to entry of final judgment by the Magistrate Judge, pursuant to 28 U.S.C. § 636(c). Upon review of the record and briefs submitted by the parties, the court concludes that the decision of the Commissioner is due to be reversed and this case remanded for further administrative proceedings.

**BACKGROUND**

Plaintiff completed the eighth grade in 1989 or 1990. (R. 56). In September 1992, when he was seventeen years old, plaintiff began working as a sizing machine tender at a Westpoint Stevens textile manufacturing plant. This work was semi-skilled and at the medium exertional level. Plaintiff worked at this job for twelve years, until September 28,

2004. (R. 47, 52, 66-68, 104, 199-200). On that date, he injured his back when he performed a twisting movement to throw a cast net while fishing. (R. 127). Two days later, he sought treatment from Dr. Patrick Martin, an orthopedist, for persistent low back pain.[1] Dr. Martin evaluated and treated plaintiff four times over the next month. Although plaintiff reported some improvement on October 7th and 19th, he complained of continued back pain after conservative treatment with narcotic pain medication, muscle relaxants, an NSAID, and heat. On October 28, 2004, when plaintiff reported continuing pain after using a corticosteroid dose pack, Dr. Martin referred plaintiff to Dr. John Dorchak, an orthopedic "spinal specialist," for further treatment. (Exhibit 2F).

Dr. Dorchak first evaluated plaintiff on October 12, 2004 for his complaint of lower back pain associated with left lower extremity radicular pain and paresthesias. Dr. Dorchak first had plaintiff try an epidural steroid injection. When that failed to provide plaintiff with any relief from his symptoms, Dr. Dorchak performed a lumbar discography to determine whether plaintiff was a candidate for surgery. On January 20, 2005, Dr. Dorchak admitted plaintiff to Hughston Orthopedic Hospital and performed an L5-S1 diskectomy. While plaintiff's radicular left leg pain resolved, he continued to report "a great deal" of moderate to severe lower back pain and stiffness in follow-up appointments. On March 1, 2005, several weeks after his surgery, plaintiff filed applications for disability insurance benefits and

---

[1] Plaintiff stated that he had first injured his back ten years previously and that he had experienced problems with back pain since then, but it was "off and on [and] usually it got better on [its] own." (R. 104; see also R. 94).

supplemental security income.[2]  Five months after the surgery –  noting that plaintiff had "failed conservative treatment" – Dr. Dorchak discussed treatment options with the plaintiff and made plans to schedule plaintiff "in the near future for a total disc replacement at the L5-S1 level."  (Exhibits 3F, 4F).

Six days later, on May 31, 2005, plaintiff reported to Dr. Marc Goldman of Columbus Neurologic Institute for a second opinion.  Dr. Goldman performed a physical examination and ordered x-rays and an MRI of plaintiff's lumbar spine. Dr. Goldman noted positive straight leg raising on the right, moderately limited lumbar spine flexion with production of bilateral low back pain, severely limited extension with production of low back pain in the midline.  He noted no instability on the x-rays and no residual nerve compression or other complications on the MRI; however, the MRI indicated significant degenerative disc disease at the L3-4 level.  Dr. Goldman's treatment note for June 9, 2005 indicates the following under the "medical advice" heading:  "The patient's symptoms are severe and uncontrolled. The patient has exhausted all reasonable non[-]surgical treatment options:  The patient can accept these symptoms or p[u]rsue surgical intervention with limited expectations.  He is scheduled for arthroplasty 6/23/2005."  Plaintiff did not have the arthroplasty (the disc replacement surgery tentatively scheduled to be performed by Dr. Dorchak), and did not return to Dr. Goldman for further treatment.  (Exhibit 5F, 8E, 9E).

Plaintiff sought treatment from Russell D. Peterson, D.O., beginning on January 6, 2006.  Dr. Peterson noted plaintiff's report of back pain since his surgery.  He prescribed

---

[2] See R. 40, 173 (initial determinations on Title II and Title XVI claims), Block 3 (filing date).

Mobic and Ultracet. (R. 171). In early February, at plaintiff's one-month follow-up visit with Dr. Peterson, plaintiff reported that he was "feeling better" on the Mobic and Ultracet. Dr. Peterson noted "Back 95% better[.]" (R. 170). Plaintiff's next follow-up appointment was scheduled on May 30, 2006; he reported that the "Mobic has really helped alot [sic]." Dr. Peterson noted, "Back 90% better[.]" (R. 169). On September 29, 2006, plaintiff reported pain for the previous week in his sacroiliac area, just to the right of the scar in his back. (R. 168). Three months later, at his next follow-up appointment, Dr. Peterson noted "SI better," "low back stable," and "doing well." (R. 167).

On November 27, 2007, after the claim was denied at the initial administrative levels, an ALJ conducted an administrative hearing, hearing testimony from the plaintiff, a medical expert and a vocational expert.[3] The ALJ rendered a decision on January 4, 2008. The ALJ concluded that plaintiff suffered from a severe combination of impairments: failed back surgery, degenerative disc disease and back pain. (R. 21). He found that plaintiff does not have an impairment or combination of impairments, that meets or medically equals the severity of any of the impairments in the "listings" and, further, that although plaintiff could not perform his past relevant work, he retained the residual functional capacity to perform jobs existing in significant numbers in the national economy. Thus, the ALJ concluded that the plaintiff was not disabled within the meaning of the Social Security Act. On January 30, 2009, the Appeals Council denied plaintiff's request for review and, accordingly, the decision of the ALJ stands as the final decision of the Commissioner.

---

[3] Although the ALJ indicated that the professional qualifications of the medical and vocational experts were included in the file (R. 197, 199), they are not included in the administrative transcript filed by the Commissioner in this court.

## STANDARD OF REVIEW

The court's review of the Commissioner's decision is narrowly circumscribed. The court does not reweigh the evidence or substitute its judgment for that of the Commissioner. Rather, the court examines the administrative decision and scrutinizes the record as a whole to determine whether substantial evidence supports the ALJ's factual findings. Davis v. Shalala, 985 F.2d 528, 531 (11th Cir. 1993); Cornelius v. Sullivan, 936 F.2d 1143, 1145 (11th Cir. 1991). Substantial evidence consists of such "relevant evidence as a reasonable person would accept as adequate to support a conclusion." Cornelius, 936 F.2d at 1145. Factual findings that are supported by substantial evidence must be upheld by the court. The ALJ's legal conclusions, however, are reviewed *de novo* because no presumption of validity attaches to the ALJ's determination of the proper legal standards to be applied. Davis, 985 F.2d at 531. If the court finds an error in the ALJ's application of the law, or if the ALJ fails to provide the court with sufficient reasoning for determining that the proper legal analysis has been conducted, the ALJ's decision must be reversed. Cornelius, 936 F.2d at 1145-46.

## DISCUSSION

The plaintiff challenges the Commissioner's decision, arguing that the ALJ failed to apply the Eleventh Circuit's pain standard properly and that he failed to explain why he discounted the opinions of plaintiff's treating physicians, Drs. Goldman and Dorchak. (Plaintiff's brief, pp. 6-8). Plaintiff further contends that, even assuming "that plaintiff's pain levels had decreased at the time of his treatment with Dr. Peterson in December of 2006, there was a clear indication for a closed period award of benefits from the MRI

documentation of extruded disc on January 20, 2005 through December of 2006" and that the ALJ should have awarded benefits at least for this closed period. (Id., p. 8).

## Weight Accorded to Medical Opinions

As noted above, if the ALJ fails to provide the court with sufficient reasoning for determining that the proper legal analysis has been conducted, the ALJ's decision must be reversed. O'Bier v. Commissioner of Social Security Admin., 338 Fed. Appx. 796, 798 (11th Cir. 2009)(citing Keeton v. Dep't. of Health and Human Services, 21 F.3d 1064, 1066 (11th Cir. 1994)); Cornelius, 936 F.2d at 1145-46.  A treating physician's opinion "must be given substantial or considerable weight unless 'good cause' is shown to the contrary." O'Bier, 338 Fed. Appx. at 798 (citations omitted). Additionally, "[t]he ALJ must state with particularity the weight given the different medical opinions and the reasons therefor." Id. (citations omitted).

The ALJ assigned "great weight" to the hearing testimony of the non-examining medical expert witness, Dr. Anderson, and also agreed fully with the residual functional capacity assessment of the state agency physician. (R. 24).  Dr. Anderson testified that a young man with "the impairment that [plaintiff] presently has" – *i.e.*, "chronic lower back pain due to a combination of lumbosacral disc disease which he had a [micro] . . . disc removal, L5/S1 [and] minimal degenerative arthritis of the lumbosacral spine – "would be limited to light work activities." (R. 197-98).[4]  The non-examining state agency physician,

---

[4] The ALJ asked Dr. Anderson whether he had "looked at all of the medical evidence here," (R. 197), but did not further identify or list the available medical exhibits at any point during the hearing. (See R. 188-203).

6

who reviewed all of the medical evidence then available,[5] also determined that plaintiff was limited exertionally to light work, with additional limitations. (Exhibit 6F).[6] The ALJ further gave "great weight" to Dr. Peterson's opinion in May 2006 that plaintiff's back was "90% better" and, in December 2006, that plaintiff's back "was stable and doing well." (R. 24). The ALJ did not indicate the weight he assigned to the opinions of plaintiff's other treating physicians. If the weight he accorded to those opinions were evident from the ALJ's discussion of the evidence, his failure to assign weight explicitly to the opinions might be harmless error. However, in the present case, the ALJ has not provided sufficient reasoning to permit a conclusion that the ALJ's analysis of the medical opinions comports with the law applicable to the opinions of treating physicians, at least as to plaintiff's condition before his treatment by Dr. Peterson.[7]

The ALJ's summary of the treating practitioner's medical records is incomplete in some important respects. For instance, the ALJ correctly notes that plaintiff's treating orthopedic doctor, on his initial visit in September 2004, "advised [him] not to return to work for one week." (R. 22; R. 104). However, the ALJ's summary omits the fact that, on October 19, Dr. Martin's note indicates that he was "extend[ing] his work leave." See R.

---

[5] Plaintiff did not submit Exhibit 8F, Dr. Peterson's treatment records, until two years after the state agency physician reviewed the file (see R. 166), but it appears that the state agency physician reviewed the other medical records. (See Exhibit 6F).

[6] The ALJ's RFC assessment is, with minor exception, substantially the same as the limitations expressed in Exhibit 6F.

[7] The ALJ clearly did not err by giving Dr. Peterson's observations and opinion great weight. However, Dr. Peterson's records reflect improvement in plaintiff's medical condition after Dr. Peterson began treating plaintiff in January 2006, more than fifteen months after plaintiff's injury.

22; R. 102). Thus, while it appears from the extension that Dr. Martin did not release plaintiff to return to work, the ALJ's summary of Dr. Martin's treatment notes suggests that he only restricted plaintiff from work for one week.

The ALJ does reference Dr. Dorchak's final May 20, 2005 treatment note restricting plaintiff from any work until plaintiff's scheduled disc replacement surgery which, as the ALJ correctly observes, did not take place; plaintiff did not return to Dr. Dorchak for further treatment. (R. 23). However, while the ALJ also specifically mentioned Dr. Dorchak's initial opinion in November and December 2004 that "the claimant could continue to work at a light level" (R. 23), the ALJ's summary of the evidence omits any reference whatsoever to: Dr. Dorchak's further restriction, imposed at the same time, from repetitive bending or twisting (see R. 126, 128, 129); Dr. Dorchak's limitation upon plaintiff's discharge from the January 2005 surgery from bending, lifting, twisting and other strenuous activities, as well as prolonged sitting (R. 107); his February 18, 2005 restriction to "no work" for four weeks (R. 120); or, most significantly, Dr. Dorchak's opinion, expressed in his March 18, 2005 treatment notes that plaintiff was then "incapable of gainful employment" (R. 116).[8] The

---

[8] The state agency physician gave this opinion "no weight" because "claimant is not following prescribed regime" from "Dr. Goldman who recommended additional surgery or accept present condition." He further claimed to give Dr. Dorchak's limitation to "light duty and to avoid repetitive bending" controlling weight, but did not mention the concurrent limitation to avoid "twisting" activities. (R. 160). While the ALJ adopted the RFC assessment of the state agency physician (R. 24), the ALJ did not mention or adopt the state agency physician's rationale for rejecting Dr. Dorchak's March 2005 opinion and giving controlling weight to the opinion Dr. Dorchak rendered at the very outset of the treating relationship. Accordingly, the court does not treat the rationale articulated by the state agency physician as the ALJ's rationale. However, Dr. Dorchak's limitation to avoid repetitive bending – which was given controlling weight – does not appear to be encompassed within the state agency physician's RFC assessment, which allows frequent stooping and crouching. See Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles, Appendix C (stooping defined as "bending body downward and forward by bending spine at the waist" and crouching defined as "bending body downward and forward by bending legs and spine").

ALJ notes Dr. Dorchak's diagnosis of "acutely exacerbated lumbar Scheuermann disease," but does not explain why he did not include it as part of plaintiff's severe combination of impairments. (R. 22).

Additionally, while the ALJ's summary of plaintiff's May 31, 2005 and June 9, 2005 evaluations by Dr. Goldman is fairly accurate, the ALJ does not explain the weight he gave to Dr. Goldman's assessment that plaintiff's lumbar disc degeneration was "uncontrolled, not responding to medical management or therapy" (R. 145) or that his symptoms were "severe and uncontrolled" (R. 145).

The court does not hold or even suggest that consideration of the evidence from the treatment records of Dr. Martin and Dr. Dorchak omitted from the ALJ's decision would necessarily change the ALJ's ultimate conclusion. The ALJ might be able to demonstrate "good cause" for not according substantial or considerable weight to these opinions; alternatively, he might accept the opinions but determine that plaintiff's disability did not meet the 12-month duration requirement of the Act. However, the problem is that the ALJ's decision does not indicate that he considered this evidence at all. Similarly, although the ALJ might have concluded that Dr. Goldman's opinion that plaintiff's symptoms were severe and uncontrolled is not entitled to any weight for various reasons, or that plaintiff's medically determinable impairment of "acutely exacerbated lumbar Scheuermann disease" did not impose any functional limitations beyond those caused by his degenerative disc disease, the

---

Additionally, since Dr. Goldman presented alternative courses of action to the plaintiff, and since he suggested that plaintiff could "p[u]rsue surgical intervention *with limited expectations*[,]" it is not at all clear that plaintiff's decision not to have surgery constitutes a failure to follow "prescribed" treatment. (See R. 145)(emphasis added).

opinion reflects no such analysis. Because the ALJ failed to discuss his analysis, if any, of these medical opinions, the court cannot determine whether his reasoning comports with the law.[9]

## CONCLUSION

The ALJ's decision fails to provide the court with sufficient reasoning to permit the court to determine that he conducted the proper legal analysis with regard to the medical opinions of record and, accordingly, the decision of the Commissioner must be reversed and this action remanded for further administrative processing.

Done, this 18th day of June, 2010.

/s/ Susan Russ Walker
SUSAN RUSS WALKER
CHIEF UNITED STATES MAGISTRATE JUDGE

---

[9] In view of this conclusion, the court does not reach plaintiff's additional arguments. However, the court anticipates that the Commissioner will consider them on remand.